FILED

2011 JUN 15 PM 3: 34

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

September 2010 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR **CR11-0542** |
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 371: Conspiracy; |
| JAMES LLOYD, | 18 U.S.C. § 1341: Mail Fraud; |
| ALLEN BRUCE AGLER, | 18 U.S.C. § 1343: Wire Fraud; |
| aka "Paul Kingman," | 15 U.S.C. §§ 77e and 77x: |
| JOEL LEE CRAFT, JR., | Offer and Sale of Unregistered |
| ROBERT KESKEMETY, | Securities; 18 U.S.C. |
| JADY LAURENCE HERRMANN, | § 1957(a): Monetary |
| JOSEPH MCCARTHY, | Transactions in Property |
| MATTHEW BRYAN WELLMAN-MACKIN, | Derived from Illegal Activity; |
| DANIEL MORABITO, and | 26 U.S.C. § 7201: Tax Evasion; |
| ROBERT RAMIREZ, | 18 U.S.C. § 2: Aiding and |
| | Abetting and Causing An Act To |
| Defendants. | Be Done] |

The Grand Jury charges:

SAC;EML:sac

COUNT ONE

[18 U.S.C. § 371]

A.  INTRODUCTORY ALLEGATIONS

1.  At all times relevant to this Indictment:

a.  JAMES LLOYD ("defendant LLOYD") resided in Lake Arrowhead, California.  Defendant LLOYD was a telemarketing "closer" (that is, an experienced member of the telemarketing staff who would finalize sales) first retained by co-conspirator #1 in or about 2007 to raise funds for the film "Eye of the Dolphin."  Defendant LLOYD operated his own telemarketing room (also known as a "boiler room," "independent sales office," or "ISO") and employed and paid other telemarketers, both "closers" and "fronters" (that is, less experienced members of the telemarketing staff who would cold-call potential investors and pass the names of those who were interested to closers who could conclude the sale), to help raise funds for the film "Eye of the Dolphin" ("Dolphin 1)") and its sequel, "Way of the Dolphin," also known as "Beneath the Blue" ("Dolphin 2") (collectively "the Dolphin Movies").

b.  ALLEN BRUCE AGLER, also known as "Paul Kingman" ("defendant AGLER"), resided in Sherman Oaks, California.  Defendant AGLER was a telemarketing closer retained by defendant LLOYD in or about 2007 to raise funds for the Dolphin Movies.

c.  JOEL LEE CRAFT JR. ("defendant CRAFT") resided in San Clemente, California.  Defendant CRAFT was the founder and Chief Executive Officer of American Information Strategies, Inc.

2

d.   ROBERT KESKEMETY ("defendant KESKEMETY") resided in Hallandale, Florida.  Defendant KESKEMETY was a telemarketing closer retained by co-conspirator #1 in or about 2004 to raise funds for film projects produced by co-conspirator #1, including Dolphin 1 and Dolphin 2.

e.   JADY LAURENCE HERRMANN ("defendant HERRMANN") resided in Los Angeles, California.  Defendant HERRMANN was a telemarketing closer retained by defendant LLOYD in or about 2007 to raise funds for the Dolphin Movies.

f.   JOSEPH MCCARTHY ("defendant MCCARTHY") resided in Boynton Beach, Florida.  Defendant MCCARTHY was a telemarketing closer retained by co-conspirator #1 in or about 2008 to raise funds for the Dolphin Movies.

g.   MATTHEW BRYAN WELLMAN-MACKIN ("defendant WELLMAN") resided in Los Angeles, California.  Defendant WELLMAN was a telemarketing closer retained by defendant LLOYD in or about 2007 to raise funds for the Dolphin Movies.

h.   DANIEL MORABITO ("defendant MORABITO") resided in Hermosa Beach, California.  Defendant MORABITO was a telemarketing closer retained by defendant LLOYD in or about 2007 to raise funds for the Dolphin Movies.

i.   ROBERT RAMIREZ ("defendant RAMIREZ") resided in San Pedro, California.  Defendant RAMIREZ was retained by co-conspirator #1 and was responsible for investor relations for film projects produced by co-conspirator #1, including the Dolphin Movies.

3

1        j.    Co-conspirator #1 was a former clandestine officer

2  with the Central Intelligence Agency who wrote, produced, and

3  directed independent motion pictures in Southern California

4  beginning in the early 1990s.  Co-conspirator #1 wrote, produced,

5  and directed the film Dolphin 1 and produced and directed

6  Dolphin 2.

7      2.   Defendants LLOYD, AGLER, CRAFT, KESKEMETY, HERRMANN,

8  MCCARTHY, WELLMAN, MORABITO, and RAMIREZ (collectively "the

9  defendants"), together with others known and unknown to the Grand

10  Jury, used the following companies in furtherance of the

11  conspiracy:

12      a.   Q Media Assets LLC, also known as ("aka")

13  "Quantum Media," aka "Q Media," and "Movie Bank," "MB Studio

14  Partners," "MB Partners," "MBP International LLC," "Quantum

15  Management Associates LLC," "Paradise Productions LLC," and

16  "Paradise Productions II LLC" (collectively, the "Q Media

17  entities"), were companies registered and used by co-conspirator

18  #1 in his business of producing, directing, and distributing

19  independent motion pictures, including the Dolphin Movies.

20      b.   American Information Strategies, Inc. ("AIS") was

21  a corporation located in San Clemente, California.  Defendant

22  CRAFT founded and owned AIS.  AIS was in the business of selling

23  investor lead lists to companies and telemarketing operations

24  interested in soliciting investors through telephone cold calls.

25  Defendant CRAFT, through AIS, also provided boiler room or ISO

26  services to individuals and companies interested in raising funds

27  from investors through telemarketing.  The ISO services provided

28

1  by defendant CRAFT, through AIS, included identifying

2  telemarketers and assisting with the preparation of sales

3  materials, telephone scripts, and private placement memoranda.

4  B.    OBJECTS OF THE CONSPIRACY

5        3.    Beginning in or about 2004, and continuing until in or

6  about May 2009, in Los Angeles County, within the Central

7  District of California, and elsewhere, defendants LLOYD, AGLER,

8  CRAFT, KESKEMETY, HERRMANN, MCCARTHY, WELLMAN, MORABITO, and

9  RAMIREZ, together with others known and unknown to the Grand

10  Jury, knowingly combined, conspired, and agreed to commit the

11  following offenses against the United States:

12        a.    Mail fraud, in violation of Title 18, United

13  States Code, Section 1341;

14        b.    Wire fraud, in violation of Title 18, United

15  States Code, Section 1343; and

16        c.    Offering and selling unregistered securities, in

17  violation of Title 15, United States Code, Sections 77e and 77x.

18  C.    MANNER AND MEANS OF THE CONSPIRACY

19        4.    The objects of the conspiracy were carried out, and to

20  be carried out, in substance, as follows:

21        a.    Co-conspirator #1 retained the services of

22  telemarketing closers to operate telemarketing boiler rooms to

23  raise funds for the Dolphin Movies.  Consulting agreements

24  between the Q-Media entities, on the one hand, and the closers,

25  on the other hand, typically required the payment of

26  approximately 25 percent of investor money to closers responsible

27  for raising the funds.  The closer who ran the boiler room

28  typically used the money to pay commissions to all telemarketers

involved in securing an investment.  In addition to the
25 percent paid to the telemarketers, investor money was also
typically used to pay for lead lists purchased from AIS and
others, rent for the telemarketing boiler room, telephone bills
and mailing expenses incurred by the boiler room, and printing
costs for sales and promotional materials, among other things.

b.   Closers, including defendants LLOYD, AGLER,
KESKEMETY, HERRMANN, MCCARTHY, and WELLMAN, used fronters to cold
call individuals from lead lists purchased from AIS and other
vendors.  The defendants provided the fronters with scripts
touting the Dolphin Movies and the profitability of investing in
motion pictures, to use in soliciting potential investors.
Fronters who identified interested investors caused promotional
materials prepared by the defendants and their co-conspirators,
such as a private placement memorandum ("PPM"), subscription
agreement, and sales literature, to be delivered to interested
investors via the United States mails or interstate commercial
carriers.  The fronters then turned the solicitation of investors
who welcomed the receipt of sales materials over to a closer.

c.   The closers held themselves out as "assistant
producers," "associate producers," or "executive producers" of
the Dolphin Movies.  Closers also often touted co-conspirator
#1's background as a former clandestine officer with the CIA in
order to assure victim investors that representations in the
solicitation materials and statements by the closers were true
and investments in the Dolphin Movies were safe.

d.   Fronters and closers made material
misrepresentations, told material half-truths, and concealed

6

materials facts, when speaking to investors.  As further
described below, these misrepresentations, half-truths, and
concealed facts related to, among other things, the percentage or
amount of investor money that would be spent on the production
and promotion of the Dolphin Movies (as opposed to the cost of
raising money from investors), the anticipated amount and timing
of returns to investors, whether investors would be the first in
line to receive these returns, the safety of the investment, the
existence of completed or almost-completed distribution
agreements, and the success of co-conspirator #1's previous film
projects.

    e.    Fronters and closers provided investors with
written materials indicating that the Dolphin Movies were
"projected" to make a 28 to 29 percent return on the investment
and could make up to well over a 1,000 percent return on the
investment.

    f.    Closers often invited investors to participate in
telephone conference calls for the purported purpose of providing
updates and information about the Dolphin Movies.  After
providing conference call participants with updates about the
progress of the films, which updates usually included false and
misleading statements, the closers often attempted to "reload"
the investors, that is, to solicit new investment money from
prior investors.  In order to generate enthusiasm in the
conference call participants, the closers often paid other
telemarketers to call into the conference calls posing as
investors (the "paid plants").  After the updated information was
provided, the paid plants would enthusiastically commit to

7

investing additional money into the films to induce other
participants in the calls to invest additional money in the
Dolphin Movies.

     g.   The closers urged many investors who had savings
in retirement accounts to liquidate those accounts and open self-
directed individual retirement accounts ("IRAs") that would
permit investments in the Dolphin Movies.  The defendants and
their co-conspirators often represented to investors that
investments in the Dolphin Movies through the investors' IRA were
safe and secure because the investments could be held at self-
directed IRA custodians with names like "Sterling Trust."

     h.   Investors who sent money to invest in the Dolphin
Movies received certificates documenting their ownership interest
in one of the Dolphin Movies.  These certificates were sent
through the United States mails and interstate commercial
carriers.

    5.   The investments in Paradise Productions LLC (for
Dolphin 1), Paradise Productions II LLC (for Dolphin 2), and
Q Media Assets LLC (for Dolphin 2) sold by the defendants to
investors consisted of partnership "Units" that were not
registered with the United States Securities and Exchange
Commission (the "SEC") in that no registration statement or
prospectus for the "Units" was ever filed with the SEC or
declared "effective" by the SEC, and no exemption to the
registration requirements applied.  As a result, as the
defendants then knew, the offer and sale of the Units to
investors nationwide through the mails and interstate wires
violated the federal securities laws.

D.   MATERIAL MISREPRESENTATIONS

6.   The objects of the conspiracy were further carried out by the defendants and their co-conspirators through the following material false and fraudulent pretenses, representations, and promises, among others:

a.   That 96 percent of investor money in Paradise Productions LLC would be used for the production, promotion, and marketing of Dolphin 1, its soundtrack, and related revenue-producing assets.

b.   That 95 percent of investor money in Paradise Productions II LLC would be used for the production, promotion, and marketing of Dolphin 2, its soundtrack, and related revenue-producing assets.

c.   That over 83 percent of investor money in Q-Media Assets LLC would be used in the production, promotion, and marketing of Dolphin 2, and other revenue-producing assets.

d.   That salespeople who sold Units in the Dolphin Movies were employees who got paid for their work on the films "on the backend."

e.   That no commissions would be paid for the sale of the Units in Paradise Productions LLC (Dolphin 1) and Paradise Productions II LLC (Dolphin 2).

f.   That no more than 17 percent of investor money in Q-Media Assets (Dolphin 2) would be used to pay costs of operating the entity, including costs associated with the offer and sale of the Units, such as commissions.

g.   That investors were expected to receive substantial returns on their investments ranging from 28 percent to well over 1,000 percent.

h.   That Dolphin 1 was successful and investors in the project made profits on the investment.

i.   That distribution agreements in hand or under negotiation would contribute significant revenue and minimize risk to investors.

j.   That sales of Units in the Dolphin Movies would soon be sold out, were oversubscribed, or would soon be closed, such that the investor would lose out on the opportunity to invest unless the investor sent their money and paperwork in soon.

k.   That investors were "first in line" to receive returns from revenues generated by the Dolphin Movies from theatrical and video release, cable television, and international distribution.

E.   CONCEALMENT OF MATERIAL FACTS

7.   In addition, the defendants and their co-conspirators knowingly concealed and willfully caused others to conceal the following material facts, among others, from investors and potential investors:

a.   That at least 35 percent of investor money was used to pay sales commission and other expenses related to the offer and sale of the Units in Paradise Productions (Dolphin 1), Paradise Productions II (Dolphin 2), and Q-Media Assets (Dolphin 2).

10

b. That investors in the prior motion pictures produced by co-conspirator #1 financed through telemarketers lost most of their money.

c. That Dolphin 1 made only $72,000 in ticket sales in its theatrical release.

d. That investors in Dolphin 1 lost most of their money.

F. OVERT ACTS

8. In furtherance of the conspiracy, and to accomplish its objects, defendants LLOYD, AGLER, CRAFT, KESKEMETY, HERRMANN, MCCARTHY, WELLMAN, MORABITO, and RAMIREZ, together with others known and unknown to the United States Attorney, committed and willfully caused others to commit the following overt acts, among others, in the Central District of California and elsewhere:

Overt Act No. 1: On or before October 27, 2004, defendant KESKEMETY participated in an interstate telephone call with victim investor G.P. in Belair, Maryland, during which defendant KESKEMETY solicited an investment in Dolphin 1 and told G.P. that investment in Dolphin 1 carried no risk and the worst case scenario was that G.P. would make a 200 percent return on the investment.

Overt Act No. 2: In or about April 2007, defendant WELLMAN participated in an interstate telephone call with victim investor T.P.A. in Howell, New Jersey, during which defendant WELLMAN solicited an investment in Dolphin 1 and told T.P.A. that an investment in Dolphin 1 was a "sure thing" and that T.P.A. would at least double his money.

Overt Act No. 3: In or about July 2007, defendant HERRMANN sent a package via FedEx to victim investor J.M. in Port Orchard, Washington, containing a subscription agreement and IRA rollover documentation from Sterling Trust for an investment in Dolphin 1.

Overt Act No. 4: In or about October 2007, defendant KESKEMETY participated in an interstate telephone call with victim investor D.S. in Soperton, Georgia, during which defendant KESKEMETY solicited D.S. to invest in Dolphin 2, told D.S. that investment in Dolphin 2 had minimal risk and was a slam dunk, and warned D.S. not to miss the opportunity.

Overt Act No. 5: On or before October 29, 2007, defendant KESKEMETY purchased a lead list from AIS for use in soliciting investors to invest in movies produced by co-conspirator #1, including "Eye of the Dolphin."

Overt Act No. 6: In or about early January 2008, defendant HERRMANN sent a package via FedEx to victim investor J.M.P. in Farmington Hills, Michigan, containing sales literature for an investment in Dolphin 2 and a document titled "Sales Analysis" that included four profitability estimates for the film.

Overt Act No. 7: In or about early January 2008, a co-conspirator and defendant AGLER participated in an interstate telephone call with victim investor J.M. in Port Orchard, Washington, during which defendant AGLER, using the false name "Paul Kingman," said that Q Media had just received a foreign distribution contract for Dolphin 2 for enough money to cover all of the $5 million put into the film by investors.

12

1    Overt Act No. 8: On or about January 22, 2008,

2  defendants LLOYD and AGLER conducted an interstate telephone

3  conference call with investors during which defendants LLOYD and

4  AGLER claimed that Dolphin 1 was successful, was sold through

5  Wal-Mart Stores, Inc., and was "always rented" out at

6  Blockbuster, before soliciting investments in Dolphin II.

7    Overt Act No. 9: In or about March 2008, defendant

8  WELLMAN participated in an interstate telephone call with victim

9  investor L.J. in Linden, Virginia, during which defendant WELLMAN

10  solicited L.J. to invest in Dolphin 2.

11    Overt Act No. 10: In or about April 2008, defendant

12  MCCARTHY participated in an interstate telephone call with victim

13  investor G.R. in Falls Church, Virginia, during which defendant

14  MCCARTHY said that Dolphin 1 had been successful and solicited an

15  investment in Dolphin 2 from G.R.

16    Overt Act No. 11: In or about May 2008, defendant

17  MCCARTHY sent a package via FedEx to victim investor D.D. in

18  Tuscon, Arizona, containing sales literature for an investment in

19  Dolphin 2 and a document titled "Sales Analysis" that included

20  four profitability estimates for the film.

21    Overt Act No. 12: On or about May 28, 2008, defendant

22  MORABITO sent a package via FedEx to victim investor P.P. in

23  Saint Paul, Minnesota, containing sales literature for an

24  investment in Dolphin 2, including a PPM, subscription agreement,

25  and correspondence.

26    Overt Act No. 13: On or about July 1, 2008, defendant

27  MORABITO participated in an interstate telephone call with victim

28  investor D.B. in Endwell, New York, during which defendant

MORABITO reviewed sales literature sent to D.B. for investment in Dolphin 2 and told D.B. that Dolphin 1 had been successful and profitable.

Overt Act No. 14: On or about August 6, 2008, defendants LLOYD and AGLER conducted an interstate telephone conference call with investors during which defendants LLOYD and AGLER, while soliciting investments in Dolphin 2, claimed that Dolphin 1 had been released in 123 theaters and on DVD, and that "tens of millions" of people had viewed the movie.

Overt Act No. 15: On or about August 27, 2008, defendant AGLER conducted an interstate telephone conference call with investors during which defendant AGLER solicited investments in Dolphin 2 and represented that the Walt Disney Company had agreed to purchase advertising space on the WeEarth.com website, which constituted another source of revenue and profits for investors in Dolphin 2.

Overt Act No. 16: In or about October 2008, defendant CRAFT entered into an agreement with co-conspirator #1 to provide unlimited sales lead lists and ISO services such as telemarketers and sales strategies in exchange for payment of approximately $20,000 per month for 12 months.

Overt Act No. 17: On or about December 17, 2008, defendant AGLER, using the false name "Paul Kingman," participated in an interstate telephone call with victim investor C.H. in Mesa, Arizona, during which defendant AGLER solicited an investment in Dolphin 2 and told C.H. that investment in Dolphin 2 was safe and secure because the producers of Dolphin 2

14

were negotiating a distribution agreement with Paramount Studios that would cover the production costs of the film.

Overt Act No. 18: On or about January 15, 2009, defendant HERRMANN participated in an interstate telephone call with victim investor N.P. in Knoxville, Tennessee, during which defendant HERRMANN solicited an investment in Dolphin 2 by telling N.P. that the prior film, Dolphin 1, had been successful and that investment in Dolphin 2 was low risk.

Overt Act No. 19: In or about March 2009, defendants WELLMAN and RAMIREZ participated in an interstate telephone call with victim investor T.P.A. in Howell, New Jersey, during which defendants WELLMAN and RAMIREZ solicited an investment in Dolphin 2 by telling T.P.A. that investors in prior movies produced by Q Media and co-conspirator #1 had invested hundreds of thousands of dollars and made millions on the investments.

Overt Act No. 20: On or about May 1, 2009, defendant RAMIREZ participated in an interstate telephone call with victim investor J.M.P. in Farmington Hills, Michigan, during which defendant RAMIREZ told J.M.P. that the worst case scenario was that Dolphin 2 would make $2 to $5 million in its theatrical release.

15

COUNTS TWO THROUGH ELEVEN

[18 U.S.C. § 1341]

9.  The Grand Jury repeats, realleges, and incorporates paragraphs 1 and 2 and paragraphs 4 through 8 of this Indictment as though fully set forth herein in their entirety.

10.  Beginning in or about 2004, and continuing to at least in or about May 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendants LLOYD, AGLER, CRAFT, KESKEMETY, HERRMANN, MCCARTHY, WELLMAN, MORABITO, and RAMIREZ, together with others known and unknown to the Grand Jury, knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud investors in the Dolphin Movies as to material matters, and to obtain money from such investors by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

G.  THE MAILINGS

11.  On or about the dates set forth below, within the Central District of California, and elsewhere, defendants LLOYD, AGLER, CRAFT, KESKEMETY, HERRMANN, MCCARTHY, WELLMAN, MORABITO, and RAMIREZ, for the purpose of executing and attempting to execute the above-described scheme to defraud, caused the following items to be placed in an authorized depository for mail matter, to be sent and delivered by the United States Postal Service and by private and commercial interstate carrier, according to the directions thereon:

//
//

16

| COUNT | DEFENDANTS | DATE | MAIL MATTER | FROM/TO |
|-------|-----------|------|-------------|---------|
| TWO | KESKEMETY, CRAFT | 6/2007 | PPM for investment in Paradise Productions LLC | Q Media in the Central District of California to victim G.P. in Bel Air, Maryland |
| THREE | HERRMANN, LLOYD, CRAFT | 7/27/07 | Subscription agreement and Sterling Trust IRA rollover documents for investment in Paradise Productions II LLC | Q Media in the Central District of California to victim J.M. in Port Orchard, Washington |
| FOUR | KESKEMETY, CRAFT | 10/2007 | Subscription agreement and IRA rollover documents for investment in Paradise Productions II LLC | Victim D.S. in Soperton, Georgia, to Q Media in the Central District of California |
| FIVE | HERRMANN, LLOYD, CRAFT | 1/2008 | Sales literature for investment in Paradise Productions II LLC | Q Media in the Central District of California to victim J.M.P. in Farmington Hills, Michigan |
| SIX | MCCARTHY, LLOYD, CRAFT | 4/14/08 | Sales literature for investment in Q Media Assets LLC | Q Media in the Central District of California to victim G.R. in Falls Church, Virginia |
| SEVEN | MCCARTHY, LLOYD, CRAFT | 5/8/08 | IRA rollover documents for investment in Q Media Assets LLC | Victim D.D. in Tuscon, Arizona, to Q Media in the Central District of California |

| COUNT | DEFENDANTS | DATE | MAIL MATTER | FROM/TO |
|-------|-----------|------|-------------|---------|
| EIGHT | MORABITO, LLOYD, CRAFT | 5/28/08 | Sales literature for investment in Paradise Productions II LLC | Q Media in the Central District of California to victim P.P. in Saint Paul, Minnesota |
| NINE | AGLER, LLOYD, CRAFT | 7/30/08 | Subscription agreement for investment in Q Media Assets LLC | Victim M.M. in Kansas City, Missouri, to Q Media in the Central District of California |
| TEN | WELLMAN, AGLER, CRAFT | 9/29/08 | Subscription agreement and Sterling Trust IRA rollover documents for investment in Q Media Assets LLC | Victim J.M. in Port Orchard, Oregon, to Q Media in the Central District of California |
| ELEVEN | AGLER, MCCARTHY, LLOYD, CRAFT | 12/18/08 | Subscription agreement for investment in Q Media Assets LLC | Victim K.H. in Mesa, Arizona, to Q Media in the Central District of California |

18

COUNTS TWELVE THROUGH TWENTY

[18 U.S.C. § 1343]

12.   The Grand Jury repeats, realleges, and incorporates paragraphs 1 and 2 and paragraphs 4 through 8 of this Indictment as though fully set forth herein in their entirety.

13.   Beginning in or about 2004, and continuing to at least in or about May 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendants LLOYD, AGLER, CRAFT, HERRMANN, MCCARTHY, WELLMAN, MORABITO, and RAMIREZ, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud investors in the Dolphin Movies as to material matters, and to obtain money and property from such investors by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

H.   THE WIRES

13.   On or about the dates set forth below, within the Central District of California, and elsewhere, defendants LLOYD, AGLER, CRAFT, HERRMANN, MCCARTHY, WELLMAN, MORABITO, and RAMIREZ, for the purpose of executing the above-described scheme to defraud, transmitted, caused the transmission of, the following items by means of wire and radio communication in interstate and foreign commerce:

//

//

//

//

| COUNT | DEFENDANTS | DATE | ITEM WIRED |
|-------|-----------|------|------------|
| TWELVE | WELLMAN, LLOYD, CRAFT | 4/2007 | Telephone call from the Central District of California to victim T.P.A. in Howell, New Jersey |
| THIRTEEN | AGLER, LLOYD, CRAFT | 1/2008 | Telephone call from the Central District of California to victim J.M. in Port Orchard, Washington |
| FOURTEEN | LLOYD, AGLER | 1/22/08 | Telephone conference call from the Central District of California including victim J.M.P. in Farmington Hills, Michigan |
| FIFTEEN | WELLMAN, LLOYD, CRAFT | 3/2008 | Telephone call from the Central District of California to victim L.J. in Linden, New Jersey |
| SIXTEEN | MORABITO, LLOYD, CRAFT | 7/1/08 | Telephone call from the Central District of California to victim D.B. in Endwell, New York |
| SEVENTEEN | LLOYD, AGLER | 8/6/08 | Telephone conference call from the Central District of California including investor D.B. in Endwell, New York |
| EIGHTEEN | HERRMANN, LLOYD, CRAFT | 1/15/09 | Telephone call from the Central District of California to victim N.P. in Knoxville, Tennessee |
| NINETEEN | RAMIREZ, WELLMAN | 3/2009 | Telephone call from the Central District of California to victim T.P.A. in Howell, New Jersey |
| TWENTY | RAMIREZ | 6/1/09 | Telephone call from the Central District of California to victim J.M.P. in Farmington Hills, Michigan |

COUNTS TWENTY-ONE THROUGH TWENTY-NINE

[15 U.S.C. §§ 77e and 77x; 18 U.S.C. § 2]

15. The Grand Jury repeats, realleges, and incorporates paragraphs 1 and 2 and paragraphs 4 through 8 of this Indictment as though fully set forth herein in their entirety.

16. On or about the following dates, in the Central District of California, and elsewhere, defendants LLOYD, AGLER, CRAFT, KESKEMETY, HERRMANN, MCCARTHY, WELLMAN, MORABITO, and RAMIREZ, directly and indirectly, aided and abetted by each other, together with others known and unknown to the Grand Jury, willfully used and caused to be used the means and instruments of transportation and communication in interstate commerce and the mails to sell the following securities of Paradise Productions LLC, Paradise Productions II LLC, and Q Media Assets LLC, when no registration statements were filed with the SEC and in effect as to such securities:

| COUNT | DEFENDANTS | DATE | SALE OF UNREGISTERED SECURITIES |
|---|---|---|---|
| TWENTY-ONE | WELLMAN, LLOYD, CRAFT | 9/12/07 | Units of Paradise Productions LLC to victim T.P.A. |
| TWENTY-TWO | KESKEMETY, CRAFT | 10/2007 | Units of Paradise Productions II LLC to victim D.S. |
| TWENTY-THREE | MCCARTHY, LLOYD, CRAFT | 6/20/08 | Units of Q Media Assets LLC to victim D.D. |
| TWENTY-FOUR | WELLMAN, LLOYD, CRAFT | 6/23/08 | Units of Q Media Assets LLC to victim L.J. |
| TWENTY-FIVE | HERRMANN, LLOYD, CRAFT | 8/4/08 | Units of Paradise Productions II LLC to victim J.M.P. |
| TWENTY-SIX | AGLER, LLOYD, CRAFT | 8/8/08 | Units of Q Media Assets LLC to victim M.M. |

| COUNT | DEFENDANTS | DATE | SALE OF UNREGISTERED SECURITIES |
|---|---|---|---|
| TWENTY-SEVEN | MCCARTHY, LLOYD, CRAFT | 8/8/08 | Units of Q Media Assets LLC to victim G.R. |
| TWENTY-EIGHT | MORABITO, LLOYD, CRAFT | 8/25/08 | Units of Q Media Assets LLC to victim D.B. |
| TWENTY-NINE | HERRMANN, LLOYD, CRAFT | 1/30/09 | Units of Paradise Productions II LLC to victim J.M. |

22

COUNTS THIRTY AND THIRTY-ONE

[18 U.S.C. §§ 1957(a), 2]

17.  The Grand Jury repeats, realleges, and incorporates paragraphs 1 and 2 and paragraphs 4 through 8 of this Indictment as though fully set forth herein in their entirety.

18.  On or about the dates set forth below, in San Bernardino County, within the Central District of California, and elsewhere, defendant JAMES LLOYD, together with others known and unknown to the Grand Jury, knowing that the funds involved represented the proceeds of some form of unlawful activity, conducted and willfully caused others to conduct the following monetary transaction affecting interstate commerce in criminally derived property of a value greater than $10,000, which property, in fact, was derived from specified unlawful activity, namely mail and wire fraud in violation of Title 18, United States Code, Sections 1341 and 1343, respectively:

| COUNT | DATE | FINANCIAL TRANSACTION |
|---|---|---|
| THIRTY | 7/6/07 | Check # 7116 in the amount of $12,500 payable to Lake Arrowhead Country Club |
| THIRTY-ONE | 4/13/09 | Check # 7678 in the amount of $35,001.88 payable to Toyota of San Bernardino |

## COUNT THIRTY-TWO

[26 U.S.C. § 7201]

19. The Grand Jury repeats, realleges, and incorporates paragraphs 1 and 2 and paragraphs 4 through 8 of this Indictment as though fully set forth herein in their entirety.

20. During the calendar year 2007, defendant JOEL LEE CRAFT JR. ("defendant CRAFT") had and received taxable income in the sum of approximately $426,682. Well knowing and believing the foregoing facts, on or about April 15, 2008, in Orange County, within the Central District of California, and elsewhere, defendant CRAFT did willfully attempt to evade and defeat the income tax due and owing by him to the United States of America for the calendar year by failing to make an income tax return on or before April 15, 2008, as required by law, to any proper officer of the Internal Revenue Service; by failing to pay to the Internal Revenue Service the income tax; and by concealing and attempting to conceal from all proper officers of the United States of America his true and correct income.

COUNT THIRTY-THREE

[26 U.S.C. § 7201]

21.  The Grand Jury repeats, realleges, and incorporates paragraphs 1 and 2 and paragraphs 4 through 8 of this Indictment as though fully set forth herein in their entirety.

22.  During the calendar year 2008, defendant JOEL LEE CRAFT JR. ("defendant CRAFT") had and received taxable income in the sum of approximately $289,559.  Well knowing and believing the foregoing facts, on or about April 15, 2009, in Orange County, within the Central District of California, and elsewhere, defendant CRAFT did willfully attempt to evade and defeat the income tax due and owing by him to the United States of America for the calendar year by failing to make an income tax return on or before April 15, 2009, as required by law, to any proper officer of the Internal Revenue Service; by failing to pay to the

//
//
//
//
//
//
//
//
//
//
//
//
//

Internal Revenue Service the income tax; and by concealing and attempting to conceal from all proper officers of the United States of America his true and correct income.

A TRUE BILL

_____
Foreperson

ANDRÉ BIROTTE JR.
United States Attorney

*Dowiny c. lum*
*Dep. Chief. Crim. Div. Flk ;*
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

BEONG-SOO KIM
Assistant United States Attorney
Chief, Major Frauds Section

STEPHEN A. CAZARES
Assistant United States Attorney
Deputy Chief, Major Frauds Section

ELLYN MARCUS LINDSAY
Assistant United States Attorney
Major Frauds Section